**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, N.W.<br>Washington, DC 20580<br><br>Plaintiff,<br><br>v.<br><br>**COSTAR GROUP, INC.**<br>1331 L Street, N.W.<br>Washington, DC 20005<br><br>And<br><br>**RENTPATH HOLDINGS, INC.**<br>950 East Paces Ferry Road N.E. #2600<br>Atlanta, GA 30326<br><br>Defendants. | Civil Action No. _____-cv-_____<br><br><br>**PUBLIC VERSION** |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION PURSUANT TO**
**SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT**

CoStar proposes to acquire its chief competitor for apartment internet listing services, RentPath. Unless enjoined, the acquisition will eliminate price and quality competition that benefits renters and property managers today, resulting in higher prices for the internet listing services relied upon by managers of large apartment buildings. RentPath has summarized the effect of this transaction in simple terms: "Prices WILL NOT stay the same, it will almost be a monopoly."

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court to enter a temporary restraining order and grant a preliminary injunction enjoining Defendants CoStar Group, Inc. ("CoStar"), and RentPath Holdings, Inc.

1

("RentPath"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships, and joint ventures, from consummating CoStar's proposed acquisition of RentPath (the "Acquisition"). Plaintiff seeks this provisional relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b).   Absent such relief, CoStar and RentPath (collectively, "Defendants") would be free to consummate the Acquisition after December 4, 2020, at 11:59 p.m. EST.

Plaintiff requires the aid of this Court to maintain the status quo and prevent harm to competition during the pendency of an administrative proceeding on the merits.   The Commission has already initiated that administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on November 30, 2020.   Pursuant to FTC regulations, the administrative hearing on the merits is scheduled to begin on June 1, 2021.   That administrative hearing will determine the legality of the Acquisition and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Acquisition.

## I.   NATURE OF THE CASE

1.   This is an action to temporarily restrain and preliminarily enjoin the nation's largest supplier of residential rental internet listing services ("ILSs") from acquiring its closest rival.   Both Defendants operate ILSs, which are websites such as Apartments.com, ForRent.com, Rent.com, and ApartmentGuide.com that match prospective renters with available apartments.   For prospective renters, ILSs provide zero-price, user-friendly interfaces to search for a place to live from a database of available units.   For apartment owners and managers, ILSs help to fill apartments by creating and targeting advertisements of vacant units to interested prospective renters.   Millions of U.S. consumers rely on ILSs each year to gather information about rental

properties, or to contact property managers about leasing an apartment.  According to RentPath, "86% of renters use an ILS during their search."

2.     A significant number of prospective renters use ILSs because they provide renters with a free and efficient apartment search experience.  ILSs enable prospective renters to quickly search and filter a large quantity of rental listings to identify only listings that satisfy relevant criteria, such as number of bedrooms, monthly rent, available move-in date, and amenities like swimming pools or exercise rooms.  Without leaving the ILS website, prospective renters can then obtain detailed information to compare the units they are considering, often including floor plans, real-time vacancy information, and high-quality photos or video tours.  In the words of CoStar's Vice President of Product, ILSs thus allow prospective renters "to get a sense of [each] community without actually being there."  According to a 2019 Confidential Information Presentation prepared by RentPath, renters plainly value this convenient and data-rich search experience: "Among recent renters, █% say an ILS was the most helpful resource—more than 3x the next best resource."

3.     Defendants are able to provide free ILS search services to prospective renters because they charge fees to property managers to display rental properties on the ILS websites. CoStar and RentPath use a subscription-based business model, typically charging property managers a monthly, per-complex fee for ILS advertising and certain additional services.  Property managers benefit from appearing on ILSs because ILSs attract significant numbers of prospective renters and provide a way for the prospective renters to contact a property directly to express interest in a rental unit.  Such contacts are referred to as "leads," and allow the property manager to direct further marketing activity to prospective renters who are already known to be promising customer targets.

4.      The primary source of ILS revenues is the fees paid by property management companies ("PMCs").  PMCs manage marketing activity for one or more apartment buildings, either as third-party contractors or as owner-operators.

5.      For many PMCs, ILSs provide an attractive form of advertising because they generate a significant volume of quality leads.  Leads generated by ILSs are particularly useful to PMCs because they come from prospective renters who have gained a significant amount of information about a unit from the ILS—including whether the unit meets their key criteria—and thus are more likely to want to rent the unit.

6.      In addition to requiring a high volume of quality leads, PMCs that manage large apartment complexes have specific needs that Defendants' ILSs are uniquely well placed to satisfy. Defendants' ILSs employ a comparatively large and geographically dispersed sales force to maintain client relationships and promptly address PMC customers' needs and concerns. Defendants' ILS advertising subscription packages include various features beyond the simple posting of a property listing, such as HD video and 3D virtual tour production, generation of 2D or 3D floorplans, on-site photo shoots, display and social retargeting advertisements, and access to analytics to help customers better understand the efficacy of their marketing and refine their competitive strategies.  These features of Defendants' ILS offerings help maximize the proportion of visitors to Defendants' ILSs who will contact a property for further information, or in other words, submit a "lead."

7.       Reflecting these distinctive needs, PMCs managing large apartment complexes use Defendants' ILSs heavily.  Nationally, approximately 70 percent of apartment complexes with 200 or more units, and approximately 50 percent of apartment buildings with 100 to 199 units, advertise on one or both of the Defendants' ILSs.

8.      For years, CoStar and RentPath have competed fiercely with one another to sell ILS advertising to PMCs in metropolitan areas across the United States.  For example, CoStar's internal documents reflect that in 2019, CoStar launched a sales campaign to "[c]ompet[e] directly and powerfully with RentPath for the business of our duplicative clients and those unique properties using RentPath but not Apartments.com."  In preparing its sales staff for this campaign, CoStar informed them that RentPath itself had "severely cut [its] prices in an effort to compete."  The Acquisition will eliminate this competition, leading to increased prices for the PMCs that advertise large apartment complexes on ILSs.  Indeed, RentPath's CEO acknowledged in a 2019 e-mail to the company's Board of Directors that the Acquisition may lead to "more stable pricing and fewer promotions in the long term."

9.      These higher prices will not be counterbalanced by benefits for PMCs or for prospective renters.  To the contrary, the Acquisition will eliminate significant head-to-head competition to attract and engage prospective renters.  By way of illustration, CoStar and RentPath monitor each other's consumer-facing websites, and may adjust their content if they see something they like on the other company's website.  For example, in March 2020, RentPath created a set of best practices to help its PMC customers create high-quality, virtual apartment-tour videos to post on its ILS websites.  RentPath emphasized in communications to the PMCs that "it is extremely important for communities to be able to show [prospective renters] impactful virtual tours of their propert[ies.]"  Internal e-mails reflect that when CoStar learned of RentPath's effort to improve ███████████████████████████, CoStar quickly developed its own ███████████ to "counter" RentPath.  The Acquisition would eliminate this sort of competition in consumer-facing content and features, and thus reduce the quality of ILS search services.

10.     New entry would not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition.  Significant barriers exist for potential new entrants, due in part to the network effects that characterize ILS platforms.  Network effects occur where the value of a product depends in part on the number of users.  More specifically, *indirect* network effects arise in multi-sided platforms (like ILSs) when the value of the product to users on one side of the platform depends on the participation of users on another side.  In the ILS context, indirect network effects give rise to a classic "chicken and egg" problem: an ILS cannot provide a significant number of leads to PMCs unless it can attract a large number of prospective renters to the ILS.  However, an ILS cannot attract prospective renters unless it lists a sufficient number of properties.  Such network effects and other barriers hinder both entry by new competitors and expansion by Defendants' existing rivals.

11.     Defendants cannot show cognizable, merger-specific efficiencies that would offset the likely and substantial competitive harm resulting from the Acquisition.

12.     On November 30, 2020, by a 4-1 vote, the Commission found reason to believe that (1) the acquisition agreement constitutes an unfair method of competition in violation of Section 5 of the FTC Act and (2) the Acquisition would violate Section 7 of the Clayton Act and Section 5 of the FTC Act because the Acquisition may substantially lessen competition and/or tend to create a monopoly in one or more lines of commerce.  The Commission filed its administrative complaint on that same day.

13.     A temporary restraining order is necessary to preserve the status quo and protect competition while the Court considers the Commission's application for a preliminary injunction. Unless temporarily restrained by this Court, Defendants would be free to consummate the Acquisition after December 4, 2020, at 11:59 p.m. EST.

14.     Preliminary injunctive relief is similarly necessary to preserve the status quo and to protect competition during the Commission's ongoing administrative proceeding.  Allowing the Acquisition to proceed while the Commission is assessing the Acquisition's potential anticompetitive effects would undermine the Commission's ability to remedy the anticompetitive effects of the Acquisition if it is found unlawful after a full administrative trial on the merits.

## II.     JURISDICTION AND VENUE

15.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under the Acts of Congress protecting trade and commerce against restraints and monopolies and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

16.     Section 13(b) of the FTC Act, 15 U.S.C. §53(b), provides in pertinent part:

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district of the United States to enjoin any such act or practice.  Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . .

17.     Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

18.     The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service can be effected pursuant to a federal statute.  Fed R. Civ. P. 4(k)(1)(C).  RentPath has stipulated to personal jurisdiction in the District of Columbia in this case and CoStar's principal place of business is in the District of Columbia.  Defendants are therefore subject to personal jurisdiction in the District of Columbia.  Venue is proper in the District of Columbia under 15 U.S.C. §§ 22 and 53(b) and 28 U.S.C. § 1391(b) and (c), as both CoStar and RentPath transact business in the District of Columbia.

### III.     THE PARTIES AND THE PROPOSED ACQUISITION

19.     Plaintiff—the Federal Trade Commission—is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq*., with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

20.     CoStar is a publicly traded corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 1331 L Street, N.W., Washington, D.C. 20005.  CoStar is a top provider of data, analytics, and ILSs for the real estate industry in the United States.  CoStar earned revenues of approximately $1.4 billion in 2019, with just over $490 million derived from its network of ILSs.

21.     CoStar's ILS network includes Apartments.com, ApartmentFinder.com, and ForRent.com.  The company assembled this network through a series of acquisitions, beginning

with the purchase of Apartments.com in 2014 and more recently with the acquisition of ForRent.com in 2018.

22.    RentPath is a privately held corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its principal place of business located at 950 East Paces Ferry Road N.E. #2600, Atlanta, Georgia 30326.  RentPath's primary business is an ILS network that includes Rent.com and ApartmentGuide.com.   RentPath generated approximately ███████ in revenue in 2019, with about ████████ derived from RentPath's ILSs.

23.    On February 12, 2020, CoStar agreed to acquire RentPath for $587.5 million.  As a condition of the acquisition offer, RentPath filed for bankruptcy protection and reorganization under Chapter 11 of the United States Bankruptcy Code the same day.

24.    In authorizing the filing of this Complaint, the Commission determined that (i) it has reason to believe the Acquisition would violate the Clayton Act and the FTC Act by substantially lessening competition in one or more lines of commerce, and (ii) an injunction of the Acquisition pending the resolution of the Commission's administrative proceedings and any appeals will promote the public interest.

## IV.    RELEVANT MARKETS

25.    Defendants compete to provide residential rental ILSs, which are two-sided platforms that bring together (i) purchasers of ILS advertising (i.e., PMCs and rental properties), and (ii) consumers of ILS search services (i.e., prospective renters).  The relevant line of commerce in which the Acquisition will lead to anticompetitive effects is ILS advertising for large apartment complexes.  The relevant geographic markets in which the Acquisition will lead to anticompetitive effects are individual metropolitan areas within the United States.

A.      **Relevant Product Market: ILS Advertising for Large Apartment Complexes**

26.     Most PMCs that manage large apartment complexes rely on ILS advertising because it satisfies their distinctive requirements in ways that other methods of advertising do not. ILS advertising allows PMCs to market available units to an enormous number of prospective renters.  Other methods of advertising are unable cost-effectively to scale up to provide the same volume and quality of leads as ILS advertising. Recognizing the unique value of ILS advertising, ILSs assign great weight to the pricing of other ILS advertising providers when they determine their own prices; no other form of advertising plays as significant a role.

27.     Large apartment complexes, and the PMCs that manage them, are a distinct set of customers for ILS advertising.   These customers' advertising requirements differ from the requirements of other purchasers of ILS advertising such that they are uniquely dependent on ILS advertising to meet their needs.  The larger an apartment complex, the more likely it is to have a consistently high number of vacancies.  To fill these vacancies, a substantial majority of large apartment complexes (and the PMCs that manage them) rely on ILSs as an efficient and high-volume source of quality leads.

28.     Most large apartment complexes could not cost-effectively replace the volume of leads generated by ILS advertising through non-digital forms of advertising, such as on-site advertising, real estate brokers, or print advertising, for two reasons.  First, many other forms of advertising do not reach the same number of potential renters as ILS advertising. For example, real estate brokers and locator services—while generating high-quality leads—do not have as big of a footprint as ILSs and are cost-prohibitive to use on a large scale.  Second, other types of advertising may reach a relatively large audience but do not generate sufficient volume of high-quality leads. For example, community signage, while relatively inexpensive, typically cannot deliver high-quality leads in the volumes needed to fill a large apartment complex's vacancies.

29.     Nor could these customers economically replace ILS advertising with other forms of digital advertising, such as search engine marketing and search engine optimization, because these forms of advertising cannot cost-effectively generate the high volume of quality leads that ILS advertising customers require for large apartment complexes.   Search engine marketing involves bidding on keywords to appear in the sponsored results for relevant searches on search engines like Google and Bing.   Search engine marketing offers the potential to reach a broader pool of prospective renters but is too expensive for most PMCs to use on a scale that could replace the leads obtained through ILS advertising.   Moreover, property websites compete with ILSs for paid search traffic, bidding against Defendants on the most critical search engine marketing keywords.   This competition with ILSs for paid traffic makes it prohibitively expensive for many large properties to turn to this advertising tool to replace the volume of leads they currently receive through ILS advertising.   As a result, if the price of ILS advertising increased by a small but significant amount, customers would not substitute away from ILS advertising for large apartment complexes in sufficient volumes to render such a price increase unprofitable.   The same is true for other forms of online marketing, including search engine optimization and social media advertising.

30.     Search engine optimization is the process of designing website structure and content to increase the likelihood that the website will appear closer to the top of organic search results for relevant keywords.   Although certain PMCs that manage large apartment complexes engage in some amount of search engine optimization in addition to search engine marketing, few could increase their reliance on these tools as a cost-effective substitute for ILS advertising.   It is difficult for individual properties to compete with highly optimized, content-rich ILS websites to appear prominently in organic search results; at most, only a few property websites can secure the

coveted but scarce front-page ranking necessary to attract meaningful organic traffic.  For this reason, and because of the high cost of search engine marketing, ILS advertising is the most cost-effective way for many large properties to gain large-scale exposure to prospective renters who begin their apartment search on search engines.

31.     Some ILSs offer access to unique benefits that differentiate their advertising services from other forms of digital advertising.  For example, many ILSs offer optional ancillary services to improve their advertising customers' property listings, including data and analytics services, sending professional photographers to on-site photo shoots, generating floorplans, and creating 3D virtual tours.  In addition, ILSs often simplify PMCs' use of other forms of online marketing, by coordinating and optimizing PMCs' advertising strategies across other channels including search engine marketing, social media advertising, and other online display advertising. These ancillary services enhance the performance of ILS advertising for PMCs and can improve both the quantity and quality of leads the PMCs receive.

32.     Defendants recognize that PMCs' demand for ILS advertising for large apartment complexes is relatively inelastic.  As CoStar CEO Andrew Florance remarked on a July 2019 earnings call, "[W]hen you think about what's at stake for them as they launch a $200 million community in the lease-up, they don't really care if our ad cost[s] $1,000 or $10,000.  They're in a nine-month lease-up period and we are the source for the majority of their communities."

33.     Defendants know which of their customers' properties are large apartment complexes, because PMCs disclose the number of units in each apartment complex when advertising their properties through an ILS.  This makes large apartment complexes readily identifiable for purposes of differential pricing.

34.     Defendants can and do vary advertising pricing based on the number of units in an apartment complex, whether in their standard rate cards or in individually negotiated contracts with PMC customers.  A hypothetical monopolist similarly could implement a targeted price increase on ILS advertising for large apartment complexes.

35.     Customers of ILS advertising for large apartment complexes could not avoid a targeted price increase through arbitrage because ILS advertising is inherently property-specific. Many PMCs make decisions about whether to use ILS advertising, and which ILS to use, on a complex-by-complex basis.  PMCs (and in some cases, individual properties) must engage directly with ILSs to opt in to advertising services and to update listings for each discrete property.

36.     A hypothetical monopolist of ILS advertising profitably could impose a small but significant increase in price to customers seeking to fill vacancies for large apartment complexes. These customers would not switch to an alternative source of leads in sufficient volume to render the price increase unprofitable.  Because the hypothetical monopolist test is satisfied, ILS advertising for large apartment complexes is a relevant product market.

**B.     Relevant Geographic Markets: Individual Metropolitan Areas**

37.     ILSs provide geographically-filtered listings to renters seeking apartments in specific metropolitan areas.  A renter seeking an apartment in Tampa, Florida, for example, will only use an ILS that contains listings for apartments in Tampa to find an apartment.  Such a renter would be unwilling to use an ILS that did not include a sufficient number of quality Tampa-area listings even if the ILS did maintain listings for other areas, like Los Angeles.  Likewise, a PMC with properties in Tampa, Florida, must attract renters who have decided to live in or around Tampa.  That PMC would have no use for an ILS that is successful at generating leads from renters

interested in living in Los Angeles, but that fails to generate leads from renters interested in living in the Tampa area.

38.     In the event of a small but significant price increase, a PMC with properties in one metropolitan area could not substitute away from its current ILS to an ILS that only operates effectively in a different metropolitan area.  A PMC with properties in Tampa, Florida, could not, for example, switch to an ILS that is only available or attractive to renters seeking apartments in Los Angeles.

39.     ILSs compete to supply advertising services to PMCs within individual metropolitan areas.  This competition includes competition on region-specific price, which varies based on the location of the customers' properties, and competition on region-specific quality, including an ILS's ability to provide internet traffic and leads.

40.     ILSs also compete on the quality and breadth of their local sales forces in each metropolitan area.  For example, Defendants maintain geographically dispersed sales organizations to compete locally by means of regular property visits and other relationship-building initiatives with customers and prospects.  Defendants' ordinary-course documents demonstrate the competitive significance of their local sales staff: RentPath notes that its "[l]arge local sales force allows RentPath to tap into apartment inventory which competitors may not have access to."  Similarly, CoStar's local sales representatives are able to "actually visit, in a reasonable amount of time and distance, [CoStar's] customers in person."

41.     It is appropriate to analyze the Acquisition's competitive effects in these local, metropolitan area markets.  Because ILS advertising customers can only turn to ILSs with a local presence, a hypothetical monopolist of ILS advertising for large apartment complexes in a given metropolitan area profitably could impose a small but significant price increase.  Individual

metropolitan areas thus constitute the relevant geographic markets in which to analyze the Acquisition's impact on competition for ILS advertising for large apartment complexes.

42.   Appendix A identifies 49 of the local markets in which the Acquisition would lead to anticompetitive effects with respect to ILS advertising for large apartment complexes.  Most of these local geographic markets also include Zillow Group, Inc. ("Zillow") and a fringe of pay-for-performance ILSs that are active nationwide, including Apartment List, Inc. ("Apartment List"), and Zumper Inc. ("Zumper").  Some of the relevant local geographic markets may feature additional local competitors, but most of these local competitors are quite small, or participate in the market only tangentially (e.g., only as an add-on to other products).

43.   Though Defendants compete within individual metropolitan areas across the United States, competitive conditions are substantially similar across many of these local markets.  The Acquisition is likely to lead to anticompetitive effects in a large number of local metropolitan areas nationwide.

44.   PMCs that manage large apartment complexes in more than one region of the country often negotiate master contracts to provide common terms for their full portfolios of managed properties, with the same ILSs and under similar competitive conditions for all of their complexes.

45.   Accordingly, while the relevant geographic markets in which to analyze the Acquisition include at least the 49 metropolitan areas identified in Appendix A, national information is relevant and useful for analyzing the effect of the Acquisition.

## V.   OTHER ILS ADVERTISING FIRMS

46.   Zillow is a publicly traded company headquartered in Seattle, Washington.  Zillow offers real estate platforms and products, including a network of rental listing sites under its own

brand name, as well as the Trulia, HotPads, and Street Easy (which is focused on New York City) brands.  Zillow's primary business is an advertising-supported search portal for homes for sale.

███████████████████████████████████████████████████████████████████████

███████ Zillow offers ILS advertising to PMCs at prices based on the number of leads, leases, clicks, or listings provided.  ████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████

47.     Apartment List is a privately held company headquartered in San Francisco, California.  Apartment List operates using its brand name ███████████████████████████

████████████████████████████████ Apartment List offers ILS advertising to PMCs on a pay-for-performance basis.  ████████████████████████████████████

████████████████████████████████████

48.     Zumper is a privately held company headquartered in San Francisco, California. Zumper operates using its brand name and provides ILS advertising to properties of all sizes, ████

████████████████.  Zumper offers ILS advertising to PMCs on a pay-for-performance basis. █████████████████████████████████████████████████████

███████████████████████.

49.     In addition to Zillow, Apartment List, and Zumper, some metropolitan areas feature local competitors.  Alone or in combination, local competitors generally operate on too small a scale to constrain a post-Acquisition price increase, even in their respective local markets.

---

[1] For purposes of this Complaint, Plaintiff estimates market shares based on ILS advertising revenues from properties with over 100 units, but this unit threshold is not dispositive.  The Acquisition is also presumptively illegal when market shares are calculated using higher or lower unit counts.

## VI.    THE ACQUISITION IS PRESUMPTIVELY ILLEGAL

50.     The Acquisition would lead to a significant increase in market concentration in already highly concentrated local markets for ILS advertising for large apartment complexes.  The concentration levels in no fewer than 49 local markets, identified in Appendix A, exceed the thresholds for presumptive illegality.

51.     The 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") employ a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration.  The Merger Guidelines explain that an acquisition is presumptively unlawful if it leads to (i) a post-acquisition HHI above 2500 points and (ii) an HHI increase of more than 200 points.[2]

52.     Although the appropriate geographic markets are individual metropolitan areas, it is directionally informative to consider Defendants' aggregate market shares across the nation.  In 2019, CoStar and RentPath accounted for the vast majority of ILS revenues derived from advertising for large apartment complexes.   On a nationwide basis, CoStar recognized approximately ███████ in ILS advertising revenue from large apartment complexes; RentPath was a strong second with approximately ██████ in revenue. █████████████

████████████████████████████████████████████

████████████████████████████████████████████

███

53.     In each of the 49 local markets identified in Appendix A, the Acquisition would similarly lead to sufficient concentration and change in concentration to give rise to a presumption

---

[2] While the Merger Guidelines do not have the force of law, they have been widely accepted as persuasive by courts in this District and around the country.

of illegality.  Both the post-Acquisition concentration and the increase in concentration would far exceed the presumptive thresholds for illegality identified by the Merger Guidelines.

## VII.  THE ACQUISITION IS LIKELY TO RESULT IN ANTICOMPETITIVE EFFECTS

54.     The Acquisition will eliminate significant head-to-head competition in the relevant markets.  CoStar and RentPath are one another's closest competitors for ILS advertising for large apartment complexes, and the competition between them has benefited customers in metropolitan areas across the United States.

55.     Defendants are easily the top two providers—whether measured by ILS revenue or by leads delivered—of ILS advertising to large apartment complexes.  Defendants' ILSs closely resemble one another, and the similarity extends to their advertising business models; CoStar and RentPath are the only two major ILSs that charge monthly subscription fees to their customers, rather than relying primarily on pay-for-performance packages.  Each Defendant on its own generates far more leads for large apartment complexes than the ███ largest pay-for-performance ILSs combined.  For example, in 2019, CoStar and RentPath *each* generated approximately ███ ████ leads for large apartment complexes, ██████████████████████████ ██ .

56.     Defendants' own executives recognize that they are each other's closest competitors.  CoStar's CEO has described RentPath as CoStar's "primary competitor" during public earnings calls with CoStar's investors.  RentPath's Senior Vice President of Customer and Industry Relations put a finer point on the same sentiment, writing internally: "[O]ur only true ILS competitor is CoStar."  Industry analysts likewise view Defendants as close competitors, and have observed that if CoStar's acquisition of RentPath is allowed to proceed, despite "antitrust issues,"

it would remove the "risk" that RentPath might improve "its competitive position against http://Apartments.com."

57.     This close competition has benefited Defendants' customers, including in the form of lower advertising prices.  In recent years, CoStar has aggressively targeted properties that advertise on RentPath, running sales campaigns referred to internally as ███████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████. Through these initiatives, CoStar has offered significant discounts to RentPath's customers as well as financial incentives to spur its sales representatives to win more business from these customers.

58.     Similarly, RentPath prices aggressively against CoStar.  For example, in the summer of 2019, RentPath responded to CoStar's attempts to woo RentPath customers by brainstorming a ████████████ that would include ████████████ to protect its existing customer relationships from CoStar's advances.  According to RentPath's ████████

████████████: "We want them to see this."  RentPath ultimately decided to offer

█████████████████████████████████████████████████████████████████████

████████.  RentPath expressly shaped this offer as a competitive response to the terms of CoStar's discounts: ███████████████████████████████████████████

59.     The harm that the Acquisition will cause on the ILS advertising side of the market is not outweighed by countervailing effects on consumers of ILS search services.  To the contrary, the Acquisition will harm these consumers by eliminating close competition between Defendants to win their attention and engagement.  Today, CoStar and RentPath compete fiercely to attract prospective renters through their marketing efforts and by improving their ILS websites' features, ease of use, and quality of information.  These improvements make it faster and easier for

consumers to find the most relevant and user-friendly information to aid in their apartment search. The Acquisition will eliminate this head-to-head rivalry and reduce competitive pressure on the ILSs to improve their offerings to renters, leading to lower quality and forgone innovation.

## VIII.   LACK OF COUNTERVAILING FACTORS

60.     Defendants cannot demonstrate that entry or repositioning would be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition in each relevant market.

61.     Existing smaller ILSs will not reposition or expand to replace the ILS advertising competition lost should the Acquisition proceed.  It is expensive and time-consuming to overcome the barriers to entry and expansion facing ILSs, particularly those associated with network effects. No existing player is poised to quickly muster the necessary scale to deliver significant numbers of leads while maintaining near-term hopes of profitability.



62.

Accordingly, Zillow would not be likely to provide sufficient competitive discipline on the merged firm to eliminate or substantially offset the harm from the Acquisition.  Other, smaller ILSs lack the capital, scale, and ability to timely restore the competition that the Acquisition would destroy, whether nationally or in the relevant local markets.

20

63.    New entry is unlikely for the same reasons.  By way of illustration, the most recent entrant of significance, the mobile-based Zumper, was founded in 2012, but has failed to expand to become a meaningful competitive constraint on Defendants.  ██████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ As acknowledged by RentPath in a 2019 draft Confidential Information Presentation: "RentPath's platform offers a wide moat providing protection against market entrants."

64.     Google, LLC ("Google") does not, and will not, exert sufficient competitive discipline to eliminate or substantially offset the competitive harm associated with the Acquisition. Defendants cannot demonstrate that Google competes with Defendants in the relevant markets, let alone that it will prevent the Acquisition from resulting in competitive harm.

65.    Defendants cannot demonstrate cognizable and merger-specific efficiencies that would be sufficient to rebut the presumption and evidence of the Acquisition's likely anticompetitive effects.

## IX.    LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

66.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative proceeding.  In deciding whether to grant relief, the Court must weigh the equities and consider the Commission's likelihood of ultimate success on the merits to determine whether the injunctive relief would be in the public interest.  The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws.

67.     The Commission is likely to succeed in proving that the effect of the Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C. § 45 and that the acquisition agreement violates Section 5 of the FTC Act.  In particular, the Commission is likely to succeed in demonstrating, among other things, that:

     a.    The Acquisition would have anticompetitive effects in the relevant geographic markets for ILS advertising for large apartment complexes, and the effects on consumers of ILS search services will not mitigate, outweigh, or counterbalance these effects;

     b.    Substantial and effective entry or expansion in these markets is difficult and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition; and

     c.    The efficiencies asserted by Defendants are insufficient as a matter of law to justify the Acquisition.

68.     Preliminary relief is warranted and necessary.  In the absence of preliminary relief, should the Commission rule, after the full administrative trial, that the Acquisition is unlawful, reestablishing vigorous competition between CoStar and RentPath would be difficult, if not impossible.  Moreover, without relief from this Court, substantial harm to competition would likely occur in the interim, even if a suitable divestiture remedy were obtained later.

69.     Accordingly, the equitable relief requested here is in the public interest. Wherefore, Plaintiff respectfully request that this Court:

     a.    Temporarily restrain Defendants from taking any further steps to consummate the Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly, pending a hearing on the Commission's application for a preliminary injunction under Section 13(b);

     b.    Preliminarily enjoin Defendants from taking any further steps to consummate the Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly, pending a full administrative hearing;

    c.  Retain jurisdiction and maintain the status quo until the administrative proceeding that the Commission has initiated is concluded; and

    d.  Award such other and further relief as the Court may determine as appropriate, just, and proper.

Dated: December 2, 2020

Of counsel:

DANIEL FRANCIS
(D.C. Bar 1004918)
Deputy Director
Federal Trade Commission
Bureau of Competition

PETER RICHMAN
Assistant Director
Federal Trade Commission
Bureau of Competition
Mergers III Division

JESSICA DRAKE
Deputy Assistant Director
Federal Trade Commission
Bureau of Competition
Mergers III Division

JENNIFER MILICI
(D.C. Bar 987096)
Chief Trial Counsel
Federal Trade Commission
Bureau of Competition

HELDER AGOSTINHO (D.C. Bar 1023275)
STEVEN R. COUPER (D.C. Bar 1035229)
KELLY FABIAN
KURT HERRERA-HEINTZ
ARMANDO IRIZARRY
STEVEN KEELY
NICOLAS STEBINGER
Attorneys
Federal Trade Commission
Bureau of Competition
Mergers III Division

DEREK E. DIAZ
Attorney
Federal Trade Commission
East Central Region

Respectfully Submitted,

SUSAN MUSSER
(D.C. Bar 1531486)
Senior Trial Counsel
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Telephone: (202) 326-2122
Email: smusser@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*

24

# APPENDIX A

| DMA | Post-Merger HHI[3] | Delta HHI[4] |
|---|---|---|
| Atlanta, GA | > 6500 | > 2100 |
| Austin, TX | > 6500 | > 1800 |
| Baltimore, MD | > 6500 | > 3300 |
| Boston, MA | > 6000 | > 2400 |
| Buffalo, NY | > 8500 | > 3300 |
| Charlotte, NC | > 6500 | > 2400 |
| Chicago, IL | > 6000 | > 2300 |
| Cincinnati, OH | > 7000 | > 3500 |
| Cleveland, OH | > 7500 | > 3700 |
| Columbus, OH | > 8000 | > 3200 |
| Dallas, TX | > 6500 | > 2000 |
| Denver, CO | > 5000 | > 1400 |
| Detroit, MI | > 8000 | > 3700 |
| Houston, TX | > 6500 | > 1900 |
| Indianapolis, IN | > 7000 | > 3500 |
| Jacksonville, FL | > 6000 | > 2700 |
| Kansas City, MO | > 7000 | > 2200 |
| Las Vegas, NV | > 6000 | > 2100 |
| Los Angeles, CA | > 5500 | > 2100 |
| Louisville, KY | > 7500 | > 3300 |
| Madison, WI | > 8000 | > 2900 |
| Memphis, TN | > 7500 | > 3600 |
| Miami, FL | > 6500 | > 2400 |
| Milwaukee, WI | > 8000 | > 2800 |
| Minneapolis-St. Paul, MN | > 6500 | > 2800 |
| Nashville, TN | > 6500 | > 2800 |
| New Haven, CT | > 7000 | > 3200 |
| Norfolk, VA | > 7500 | > 3600 |
| Oklahoma City, OK | > 7000 | > 3100 |
| Omaha, NE | > 7500 | > 3500 |
| Orlando, FL | > 6500 | > 2400 |
| Philadelphia, PA | > 6500 | > 3000 |
| Phoenix, AZ | > 6000 | > 2200 |
| Pittsburgh, PA | > 7000 | > 3100 |
| Portland, OR | > 5000 | > 1100 |
| Providence, RI | > 6500 | > 2500 |

[3] HHIs are calculated for buildings with over 100 units within particular DMAs for the purposes of the Complaint.

[4] "Delta HHI" is the difference between the pre-merger HHI and the post-merger HHI.

# APPENDIX A

| | | |
|---|---|---|
| Raleigh, NC | > 6500 | > 2700 |
| Richmond, VA | > 7000 | > 3300 |
| Rochester, NY | > 8000 | > 3000 |
| Sacramento, CA | > 6500 | > 2000 |
| Salt Lake City, UT | > 7000 | > 2800 |
| San Antonio, TX | > 6500 | > 1500 |
| San Diego, CA | > 5500 | > 1900 |
| San Francisco, CA | > 5000 | > 1400 |
| Seattle, WA | > 5000 | > 1400 |
| St. Louis, MO | > 7000 | > 2700 |
| Tampa, FL | > 6500 | > 2600 |
| Tucson, AZ | > 7000 | > 3300 |
| Washington, DC | > 6000 | > 2500 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 2nd day of December 2020, I served the foregoing on

the following counsel via electronic mail:

Amanda P. Reeves, Esq.
Marguerite M. Sullivan, Esq.
Latham & Watkins LLP
555 Eleventh St., N.W.
Suite 1000
Washington, DC 20004
(202) 637-2183
amanda.reeves@lw.com
marguerite.sullivan@lw.com

*Counsel for CoStar Group, Inc.*

Jonathan S. Klarfeld, Esq.
Chong S. Park, Esq.
Ropes & Gray LLP
2099 Pennsylvania Ave., N.W.
Washington, DC 20006
(202) 508-4764
jonathan.klarfeld@ropesgray.com
chong.park@ropesgray.com

*Counsel for RentPath Holdings, Inc.*

Susan Musser, Esq.
*Attorney for Plaintiff*
*Federal Trade Commission*

27